UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| RUFUS WEST,<br><br>                      Plaintiff,<br>v.<br><br>SGT. DUSTIN KINGSLAND,<br><br>                      Defendant. | Case No. 14-CV-1146-JPS<br><br>ORDER |

In this action, filed under 42 U.S.C. § 1983, Plaintiff Rufus West ("West"), a/k/a "the Muslim," a state prisoner, claims the defendant, Sgt. Dustin Kingsland ("Kingsland") violated his First and Fourteenth Amendment rights. Presently before the Court is Kingsland's motion for summary judgment (Docket #24). The matter is now full briefed (Docket #25, #36, #40) and ready for disposition. For the reasons detailed herein, the Court will grant the motion for summary judgment and this action will be dismissed in its entirety.

1.     FACTUAL BACKGROUND[1]

In short, West alleges that Kingsland discriminated against him because he is a Muslim fasting for Ramadan and that Kingsland later retaliated against West for filing complaints. Although the parties dispute many of the specific facts, the Court finds that none are material to preclude summary judgment. When disputed, the Court views all facts in the light most favorable to West as the non-moving party.

---

[1] The facts are taken from Kingsland's proposed finding of fact ("DPFF") or West's proposed finding of fact ("PPFF") unless otherwise noted. (Docket #41, #42).

### 1.1 The Parties

West was housed at Columbia Correctional Institution ("CCI") between July 3, 2007, and April 10, 2014. (DPFF ¶ 1). West was housed on unit 9 at CCI between February 14, 2013, and August 23, 2013. (DPFF ¶ 2). Kingsland is employed by the Wisconsin Department of Corrections ("DOC") as a Correctional Sergeant at CCI. He has held that position since July 15, 2012, and has been employed by the DOC since October 17, 2005. (DPFF ¶ 3). At all times relevant, Kingsland was assigned to unit 9 at CCI where West was housed. He generally worked first shift between 6:00 a.m. and 2:00 p.m. (DPFF ¶ 4).

### 1.2 Ramadan 2013

DOC allows inmates who have chosen Islam as their religious preference to participate in the traditional Ramadan fast, which is an annual Islamic religious observance period wherein adherents practice fasting for approximately one month. (DPFF ¶ 9). Ramadan in 2013, as recognized by DOC, started at dawn on Tuesday, July 9, 2013, and continued for 30 days until sunset on Wednesday, August 7, 2013. Observing Muslims celebrated Ramadan on the sunset of Monday, July 8, 2013. (DPFF ¶ 10). Beginning July 8, 2013, meals and milk for that evening and the following morning were available for staff pick-up each evening in the kitchen. Staff were to deliver evening meals by 8:00 p.m. and morning meals and milk by 3:00 a.m. (DPFF ¶ 11). Each year, the chaplain emails a memorandum to all CCI staff informing them of the dates Ramadan will be observed and he provides instruction for meal pick-up and delivery. (DPFF ¶ 12).

In 2013, West participated in the Ramadan fast. (DPFF ¶ 13). On February 14, 2013, West was transferred from housing unit 1, to housing unit 9. (DPFF ¶ 14). Inmates housed on unit 9 sign-up for daily recreation,

dayroom and/or showers during the morning meal time when they are let out of their cell for breakfast. Inmates who refuse meals or are fasting for religious beliefs are typically let out of their cell at this same time, but only long enough to sign-up and to return to their cell. (DPFF ¶ 15).

All inmate movement in the institution is closely monitored. On unit 9, inmates are kept in their cells unless they are out for meals, work, dayroom, recreation, or showers. (DPFF ¶ 16). The unit sergeant has the discretion to not let out an inmate who is not participating in meal time, if they are disruptive, misbehave, not following directives, or loiter. This is to help ensure a safe and secure unit. (DPFF ¶ 17).

Recreation, dayroom and showers occur in the afternoons except on weekends when there is also an opportunity for morning dayroom. On Sundays, there is also an opportunity for morning shower. Inmates have the choice of which activity they would like to participate in each day the activities are offered. These activities are a privilege; not a right. Inmates may lose their privileges if they misbehave, fail to follow directives, are disruptive, or as a result of a disciplinary disposition. (DPFF ¶ 19 and Response).

1.3     Kingsland's Alleged Refusal to Allow West Out of Cell

On July 14, 2013, West alleges that Kingsland refused to allow him out of his cell during the breakfast meal to sign up for activities. (DPFF Response ¶ 21). Kingsland maintains that he did allow West out of his cell that day and that West loitered in the dayroom and went from table to table socializing with other inmates, in violation of prison policy. (DPFF ¶ 21). Other Muslim inmates who were fasting for Ramadan on unit 9 were let out of their cell to

sign up for activities during meal times[2] (DPFF ¶ 23). It is also undisputed that non-Muslim inmates that were not accepting meals that also misbehaved when they were let out of their cells to sign up for activities would not be permitted out of their cells. (DPFF ¶ 24).

On July 20, 2013, West did not make a request to Kingsland or any other staff member to be signed up for any activities during the 6:10 a.m. count. (DPFF ¶ 25). West alleges that Kingsland refused to open his door at breakfast to sign up for dayroom because he was a Muslim fasting for Ramadan. West alleges that at lunch time, while out of his cell, he asked Kingsland for two complaint forms. Kingsland asked if West was going to write him up again, and West replied, "Absolutely." Kingsland handed West a stack of 13 complaint forms and told West that he was going to need them. West filed a complaint about the July 20, 2013 incident.[3] (PPFF ¶ 15).

On July 21, 2013, July 27, 2013, July 28, 2013, and August 3, 2013, West alleges basically the same allegations that Kingsland refused to let him out of his cell because he was a Muslim fasting for Ramadan and in retaliation for his complaints. Kingsland maintains West was not allowed out of his cell due to his prior misbehavior on July 14, 2013. West filed complaints against Kingsland in each instance. (PPFF ¶¶ 16, 17, 18, 19, 20). On each of those occasions, West did not make a request to Kingsland or any other staff member to be signed up for any activities during the 6:10 a.m. count. (DPFF ¶¶ 26, 27, 28).

---

[2] West disputes that other Muslim inmates who were fasting for Ramadan were let out of their cells. (DPFF Response ¶ 23). However, the dispute is not proper because it is not based upon any personal knowledge and West has not cited to any evidentiary material to support his dispute.

[3] The record is unclear as to the date West filed a complaint for this incident.

On August 3, 2013, Kingsland allowed West out of his cell at lunchtime. West told Kingsland to sign him up for library and recreation, to which Kingsland responded sarcastically, "I'm not a religious person. That's not my problem!" (PPFF ¶ 21). On August 4, 2013, Kingsland allegedly refused to let West out of his cell at breakfast time and discriminated against West for fasting for Ramadan as a Muslim. West filed a complaint regarding this incident. (PPFF ¶ 24).

### 1.4 Cell Searches

Pursuant to Division of Adult Institutions Policy & Procedure #309.20.03(I)(B)(5), personal property of an inmate is required to fit into a box measuring 32" x 16" x 16" or 8,192 cubic inches. Canteen items are considered personal property and count towards the cubic inch limit. (DPFF ¶ 36). Pursuant to Wis. Admin. Code DOC § 306.16(1), staff may conduct a search of the living quarters of any inmate at any time. (DPFF ¶ 37).

Cell searches are conducted on a minimum of a monthly basis and may be conducted more often if necessary. Cell searches are typically alternated between shifts. For example, if a round of cell searches was conducted by second shift staff, the next round might be conducted by first shift staff. This is done to split up the work among staff. (DPFF ¶ 38). Cell searches are done throughout the month and documented in the housing unit search log book documenting the date, name of the inmate, DOC #, cell location, contraband located, staff involved, type of search and the shift during which the search occurred. (DPFF ¶ 39).

It is important to institution security and stability for staff to know what items are in the institution, and to be able to identify and remove non-approved items. Further, having excessive property in a cell over the institution limits gives an inmate more opportunity to hide potentially

dangerous or disruptive items. It also requires more staff time to conduct a thorough search. Accordingly, regular cell searches occur to help address all of these concerns. (DPFF ¶ 43). If an inmate is found to have contraband, they may receive a conduct report for violating Wis. Admin. Code § 303.47 or other contraband offenses. Conduct reports are written at the discretion of the staff involved. (DPFF ¶ 44).

On August 3, 2013, Kingsland, along with other housing unit 8 and 9 staff, conducted cell searches. (*See* DPFF ¶ 41 and Response). If Kingsland notices an inmate's cell door is open during recreation and they have not had a cell search done yet for the month, Kingsland typically commences a cell search at that time. (DPFF ¶ 46). On August 3, 2013, West's cell door was open while West was at the law library, so Kingsland commenced a search in accordance with Wis. Admin. Code DOC § 306.16(1).[4] (DPFF ¶ 47) The parties dispute whether the search revealed that West's cell was over the allowable property limits; West maintains he was not in violation of the property limits, whereas Kingsland maintains West did violate the property allowances. (DPFF ¶ 49 and Response). Kingsland documented his cell search in the unit 9 cell search logbook. (DPFF ¶ 50).

Rather than issuing West a ticket and taking his property at that time, as a courtesy, Kingsland allowed West two days to get within property limits. (DPFF ¶ 51) Upon West's return to his cell, Sergeant Goodwin told West that Kingsland had searched his cell and that he had two days to get within the property limits. (PPFF ¶ 23).

---

[4]West disputes that his cell door was open. However, the record is clear that West was located in a different part of the building at that time and has submitted evidence or personal knowledge to contradict this fact.

On August 5, 2013, Kingsland wrote and issued conduct report #1960091 for West's disrespect toward housing unit staff and disobeying directives to bring his property into compliance. West was placed into temporary lockup status ("TLU") pending the conduct report hearing. (DPFF ¶ 56). TLU is a temporary, nonpunitive segregated status allowing an inmate to be separated from the general population pending further administrative action. (DPFF ¶ 57). West was not let out of his cell during lunch to sign up for activities on August 5, 2013, because he was on TLU status. (DPFF ¶ 31). Kingsland conducted another cell search of two non-Muslim inmates on August 6, 2013. (DPFF ¶ 60).

1.5     West's Unit Transfer

In August 2013, the regular first shift Sergeant was Kingsland. With this authority, Kingsland was responsible for the movement of inmates on and off the unit on a daily basis. This included taking new inmates recently released from segregation, taking newly hired inmate workers, moving inmates to other units as needed, and dealing with problematic inmates. (DPFF ¶ 62). If Kingsland wanted an inmate to be moved off the unit, he would discuss the transfer with the unit manager, Anthony Ashworth ("Ashworth"), for approval. (DPFF ¶ 63). Inmates are often moved to another housing unit if they change status, have conflicts with staff or inmates on their current unit, if they require special assignment for education or work, or if they have medical needs. Moving an inmate to another housing unit with the same status is not punitive. (DPFF ¶ 66).

On August 23, 2013, Kingsland spoke to Ashworth about the possibility of moving West to another housing unit at CCI. (DPFF ¶ 64). West was an unassigned inmate, meaning he did not need to be assigned to any specific unit within the institution. (DPFF ¶ 34). West was moved to unit 1 on

Page 7 of 18

Case 2:14-cv-01146-JPS   Filed 11/17/15   Page 7 of 18   Document 45

August 23, 2013, but was returned to unit 9. (DPFF ¶ 72). The same day, West was transferred to housing unit 8, which is also a working complex, and, at the time, was also under Ashworth's supervision as unit manager. West had the same privileges on housing unit 8 as he had on housing unit 9. (DPFF ¶ 74). According to West's housing unit assignments, while at CCI, he has been housed on units 1, 4, 5, 8 and 9. (DPFF ¶ 75).

### 1.6 West's Complaints Against Kingsland

West has filed nine offender complaints regarding his claims in this lawsuit. All of the offender complaints were rejected except for CCI-2013-13692, which was dismissed. (DPFF ¶ 82). Captain Wogernese, who was the interim unit manager prior to Ashworth, did not discuss any of West's offender complaints with Kingsland. (DPFF ¶ 77).

## 2. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

3. DISCUSSION

Kingsland's motion for summary judgment argues that: (1) he is entitled to summary judgment on the Fourteenth Amendment claim because West was not discriminated against on the basis of his religion; (2) he is entitled to summary judgment on the First Amendment retaliation claim; (3) West is not entitled to compensatory or punitive damages; and (4) he is entitled to qualified immunity. As discussed below, the Court finds that Kingsland is entitled to summary judgment on both the Fourteenth and First Amendment claims.

3.1 Fourteenth Amendment—Equal Protection

The purpose of the equal protection clause of the Fourteenth Amendment is to "secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (citing *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441 (1923); *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 340, 352 (1918)).

To comply with equal protection, governmental entities are generally required to treat all similarly-situated persons in a similar manner. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985). "To show a violation

of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Illinois State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001). The Court will analyze each element in turn.

### 3.1.1 Discriminatory Effect

To prove discriminatory effect, plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class. *See Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000), *cert. denied*, 531 U.S. 1012 (2000); *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 944–45 (7th Cir. 1996). Here, Kingsland concedes that West, as a Muslim, is a member of a protected class. (Def's Opening Br. at 9).

A person is similarly situated to the plaintiff if the person is "comparable to the plaintiff in all material respects." *Crawford v. Indiana Harbor Belt R.R. Co.*, 461 F.3d 844 (7th Cir. 2006) (balancing the need for lenience in a broadly representative sample and frowning upon plaintiff's tendency to "cherry-pick" the best persons for comparison) (emphasis in original). It is not necessary that individuals be similar in all respect so as to define the requirement of similarly too narrowly. *See Chavez*, 251 F.3d at 636. "[T]he purpose of the similarly situated requirement is to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable…" *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

Here, West has provided no evidence of any similarly situated non-Muslim inmates who were treated differently than him. As to Kingsland's refusal to let West out of his cell, it is undisputed that non-Muslim inmates

that were not accepting meals that also misbehaved when they were let out of their cells to sign up for activities would not be permitted out of their cells. (DPFF ¶ 24). Moreover, other Muslim inmates that were observing Ramadan were still permitted out of their cells by Kingsland to sign up for activities. (DPFF ¶ 25).

As to Kingsland search of West's cell, it is undisputed that one day after the search, Kingsland searched the cells of two non-Muslim white inmates. (DPFF ¶ 60). Finally, as to Kingsland issuing West a conduct report and transferring him to another unit, West fails to identify any similarly situated non-Muslim inmate who was treated differently than him.

Thus, West is unable to demonstrate any discriminatory effect to prove an equal protection violation. For completeness, however, the Court will turn to analyze whether Kingsland's actions were motivated by discriminatory intent.

### 3.1.2   Discriminatory Intent

In order to show discriminatory intent, plaintiffs must show that the "decisionmakers in [their] case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987); *accord Chavez v. Illinois State Police*, 251 F.3d 612, 645 (7th Cir. 2001) "'Discriminatory purpose'…implies more than…intent as awareness of consequences. It implies that the decisionmaker…selected or reaffirmed a particular course of action at least in part 'because of' ... its adverse effects upon an identifiable group.'" *McCleskey*, 481 U.S. at 298 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)); *Hearne v. Bd. of Educ. of City of Chi.*, 185 F.3d 770, 776 (7th Cir. 1999) (same).

Here, the Court finds that West fails to provide any evidence to show Kingsland's actions were acted with a discriminatory purpose. West

repeatedly states that Kingsland discriminated against him because he is a Muslim fasting for Ramadan. However, these conclusory allegations are simply insufficient to defeat a motion for summary judgment, *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 840 (7th Cir. 1996.), and there is nothing else in the record that points to a discriminatory purpose. The Court recognizes that significant factual disputes exist in this case, particularly as to Kingsland's motivations for how he treated West; however, even when looking at all facts in the light most favorable to the plaintiff, there is simply nothing in the record to suggest religious discrimination other than West's conclusory allegations. For example, even if West's version of events is true—that West never loitered or broke the rules—there is still nothing in the record that indicates Kingsland's decision not to let West out of his cell were motivated in any way by West's religion. As such, the Court finds that West fails to meet the discriminatory intent prong required to prove an equal protection violation.

### 3.1.3 Equal Protection—Class of One

Finally, the Court will briefly address the defendant's argument related to class-of-one equal protection claim.[5] In *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591 (2008), the Supreme Court held that a public employee could not maintain a class of one equal protection claim based on allegations that she was arbitrarily treated differently from similarly-situated employees. The Court explained that cases in which class of one claims exist in the equal protection context involve "the existence of a clear standard against which departures, even for a single plaintiff, could be readily

---

[5]West does not make a class-of-one claim, nor did the Court allow such a claim in its screening order (Docket #10); however, for clarity, the Court will address the issue.

assessed." *Id.*, 553 U.S. at 602. The Court found that allowing claims in such discretionary circumstances would mean that "governments will be forced to defend a multitude of such claims in the first place, and courts will be obliged to sort through them in a search for the proverbial needle in a haystack." *Id.* at 608.

Courts have extended the reasoning of *Engquist* to include other types of discretionary decisions, including a prosecutor's decision to bring a case in federal, rather than state, court, *United States v. Moore*, 543 F.3d 891, 90–101 (7th Cir. 2008), and decisions made in the prison disciplinary context. *See Glover v. Dickey*, No. 14-C-0087, 2015 WL 5521858, at *6 (E.D. Wis. Sept. 18, 2015); *Grant v. Laufenberg*, No. 12-C-668, 2015 WL 1246065, at *8 (E.D. Wis. Mar. 18, 2015); *Knowlin v. Gray*, No. 12–cv–926–bbc, 2013 WL 541525, at *2–3 (W.D. Wis. Feb.13, 2013); *Jackson v. Flieger*, No. 12–cv–220–bbc, 2012 WL 5247275, at *4 (W.D. Wis. Oct. 23, 2012).

Here, the Court finds that Kingsland's discretionary decisions, regarding West being allowed out of his cell, the search of West's cell, West's conduct report, and West's transfer to another unit, are exactly the types of decisions where allowing prisoners to bring claims for the arbitrary singling out of a particular prisoner would undermine the discretion correctional officers are entrusted to exercise. *See Engquist*, 553 U.S. at 603. As such, the Court finds that West may not prevail on a class-of-one equal protection claim.

In sum, West cannot prove a discrimination claim on the basis of his religion, nor does he meet the standard for a class-of-one equal protection claim. Thus, the Court will grant Kingsland's motion for summary judgment on the equal protection claim.

### 3.2 Retaliation

Under the First Amendment, inmates have a constitutional right to file grievances and lawsuits without the threat of retaliation. *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005); *Babcock v. White*, 102 F.3d 267, 274–75 (7th Cir. 1996). Any "act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution." *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000) (citations omitted); *see also Pearson v. Welborn*, 471 F.3d 732, 738 (7th Cir. 2006) (holding same). Even conduct that otherwise does not violate the Constitution can form the basis for a retaliation claim if that conduct is done with an improper, retaliatory motive. *See DeWalt*, 224 F.3d at 618 (unconstitutional to transfer inmate for filing grievances); *Babcock*, 102 F.3d at 275 (unconstitutional to place inmate in administrative detention for filing grievances); *Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir. 1996)

To establish a prima facie case of retaliation, an inmate must produce evidence that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter protected speech; and (3) his protected speech was a motivating factor in the defendants' actions. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) (clarifying allocation of evidentiary burdens at summary judgment in light of *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)); *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011) (same). If the inmate satisfies these elements, the burden shifts to the defendants to rebut the causal inference with evidence showing that they would have taken the same action even without any retaliatory motive. *See Kidwell*, 679 F.3d at 965; *Greene*, 660 F.3d at 979.

Here, West has satisfied the first element. Kingsland appropriately concedes that West has the right under the First Amendment to file his own truthful grievances and federal lawsuits. *See Hasan v. U.S. Dep't of Labor*,

400 F.3d 1001, 1005 (7th Cir. 2005). As to the second question, the Court has serious reservations regarding whether the alleged retaliatory actions— Kingsland searching West's cell and his subsequent transfer to another housing unit—is a deprivation that would likely deter protected speech. Indeed, West continued to file grievances during this time period, nine grievances all in a short time. As the Seventh Circuit noted in *Bart v. Telford*, 677 F.2d 622 (7th Cir. 1982), "[i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Id.* at 625. However, the Court need not definitively decide this issue as the main analysis and the parties' arguments center around the third prong, which the Court now turns to discuss.

West must show a causal connection between his First Amendment activity and the deprivations he suffered. Hence, the Court will analyze whether plaintiff's constitutionally protected conduct was a motivating factor in each defendant's alleged retaliatory action. *See Greene*, 660 F.3d at 979. The Court recognizes that direct evidence of retaliation is difficult to obtain. Defendants rarely admit that they want to retaliate against someone. It is, however, well established that a plaintiff cannot establish retaliation simply by showing that the protected activity happened before the defendants took their action, *see, e.g., Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (noting that one event's following closely upon another is not dispositive in proving that the first act caused the second); *see also Stone v. City of Indianapolis Public Utils. Div.*, 281 F.3d 640, 642 (7th Cir. 2002) ("mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue"). West argues that

Page 15 of 18

Case 2:14-cv-01146-JPS   Filed 11/17/15   Page 15 of 18   Document 45

Kingsland must have had a retaliatory motive in this case, "because of the chronological history" in this case (Pl's Opp. at 24), however, this timing alone is insufficient to prove retaliation.

Kingsland argues that West's retaliation claim must fail because there is no evidence that Kingsland had any knowledge of the complaints. Indeed, "protected conduct cannot be proven to motivate retaliation if there is no evidence that the defendants knew of the protected activity." *Morfin v. City of E. Chi.*, 349 F.3d 989, 1005 (7th Cir. 2003) (internal quotation marks and brackets omitted) (quoting *Stagman v. Ryan*, 176 F.3d 986, 1000–01 (7th Cir. 1999)); *accord Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006). As Kingsland notes, West does not dispute that the complaints were confidential, nor does he dispute that Kingsland was never contacted regarding the complaints filed against him. (*See* DPFF Reply ¶¶ 76, 78, 82;).

West proffers two reasons in his opposition brief to explain how Kingsland knew of the complaints. First, that he told Kingsland he would file complaints against him on July 14 and July 20, 2013. However, threatening to file a complaint and actually filing a complaint are different scenarios. "[I]t seems implausible that a threat to file a grievance would itself constitute a First Amendment-protected grievance." *Bridges v. Gilbert*, 557 F.3d 541, 554 (7th Cir. 2009). Indeed, the Court readily acknowledges that inmates threatening to file complaints against prison employees is a fairly common practice. Thus, the Court finds these verbal threats do not support a finding that Kingsland actually knew that West followed through on his threat to file. Moreover, the fact that Kingsland already allegedly refused to let West out of his cell on July 14, 2013, prior to any grievances, suggests something other than retaliation motivated Kingsland's actions in relation to West being allowed out of his cell.

Second, West argues that Kingsland must have seen his complaints against Kingsland during the August 3, 2013 cell search. To begin, this argument is relevant only to the alleged retaliatory acts that followed the cell search and cannot show a causal link to any acts before the search. More importantly, West's belief that Kingsland saw his complaints during the cell search amounts to nothing more than speculation. The undisputed facts show that West was in a different part of the prison at the time of the search and, therefore, has no personal knowledge or other admissible evidence to show Kingsland saw the complaints. (*See* (DPFF ¶ 47 and Reply). As such, the Court finds no evidence in the record to show that Kingsland was aware of West's protected activity. Thus, West fails to show a causal connection between his First Amendment activity and the deprivations he suffered, and cannot establish a prima facie case of retaliation.

In the end, West has produced little in the way of admissible evidence to support his retaliation claims. The purported retaliation occurred before Kingsland knew about the protected conduct on which West premised this lawsuit; moreover, West has presented no evidence sufficient to show that his protected conduct was a motivating factor in Kingsland's actions. West may well feel he was treated unfairly, but the First Amendment does not provide a remedy for any and all unfair treatment. *See Shaw v. Metzen*, No. 13-CV-847-WMC, 2015 WL 5123677, at *9 (W.D. Wis. Sept. 1, 2015).

In light of the foregoing, the Court finds that no reasonable juror could find a causal connection between West's First Amendment activity and the deprivations he suffered. As such, the Court will grant Kingsland's motion for summary judgment as to the retaliation claim.

4.   CONCLUSION[6]

In sum, the Court will grant summary judgment for Kingsland and finds that: (1) West fails to prove an equal protection claim, in violation of the Fourteenth Amendment; and (2) West fails to prove a retaliation claim, in violation of the First Amendment.

Accordingly,

IT IS ORDERED that the Kingsland's motion for summary judgment (Docket #24) be and the same is hereby GRANTED, as more fully described in detail above, and that this action be and the same is hereby DISMISSED.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of November, 2015.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

---

[6] The Court need not address Kingsland's remaining arguments related to damages and qualified immunity because it finds no retaliation or equal protection violations as a matter of law. *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997) (finding that when a court determines in a § 1983 case that no constitutional violation occurred, it is unnecessary to consider whether defendants are entitled to qualified immunity).